**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BOBBY SCHLUETER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-02079** |
| | ) | **Judge Aleta A. Trauger** |
| **INGRAM BARGE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM & ORDER

Before the court are five motions *in limine*, two filed by the defendant and three by the plaintiff, seeking to exclude each others' experts. Since the same basic facts and legal standards apply to all of them, the court will provide a brief summary of the relevant facts, state the applicable standard of review, and then address each motion separately. For the reasons stated herein, the defendant's Motion to Exclude Testimony of Dr. Benjamin Johnson (Doc. No. 43) will be granted in part and denied in part. The remaining motions (Doc. Nos. 45, 47, 51, and 52) will be denied.

## I.     BACKGROUND

This case arises out of an injury suffered by plaintiff Bobby Schlueter on February 7, 2014, while he was a member of the crew of the M/V Sarah L. Ingram, a vessel owned and operated by the defendant, Ingram Barge Company ("Ingram"). Schlueter filed the Complaint initiating this action on August 8, 2016, asserting claims under the Jones Act, 46 U.S.C. § 30104, and the general maritime law of the United States. (Doc. No. 1.)

Very generally, Schlueter alleges that he was working with the vessel's second mate in cold and icy conditions, tightening wires that connected the M/V Sarah L. Ingram to the barges it

was towing. A winch that he was tightening gave way suddenly, causing him to slip and fall to the deck, landing on his right knee. The plaintiff claims that the winch was iced over and that his injuries were caused by Ingram's negligence in failing to provide a safe work place, failing to provide de-icer, and requiring the plaintiff to work in extremely icy and dangerous conditions. (*See* Compl., Doc. No. 1 ¶ 6.) The plaintiff alleges that he suffered injuries to his knee and lower back and subsequently developed Complex Regional Pain Syndrome. At issue in the case are questions of fault, causation, and damages. Both parties have engaged various experts to present their opinions on these issues.

## II.     LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court construed Rule 702 as granting district courts, acting as "gatekeepers," "discretion in determining whether . . . a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007). The Supreme Court has provided a non-exhaustive list of factors that lower courts may consider in assessing reliability: (1) whether a theory or technique can be (and has been) tested;

(2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Daubert*, 509 U.S. at 593–94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–50 (1999). The Sixth Circuit has approved the use of an additional factor: whether the expert prepared his or her opinion "solely for purposes of litigation." *Wilden v. Laury Transp., LLC*, 901 F.3d 644, 649 (6th Cir. 2018) (quoting *Johnson*, 484 F.3d at 434). The court's gatekeeping role is not limited to expert testimony based on scientific knowledge but, instead, extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. *Kumho Tire*, 526 U.S. at 147.

Whether the court applies any particular *Daubert* factor to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (citation omitted). Any weakness in the underlying factual basis generally bears on the weight, as opposed to the admissibility, of the evidence. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citations omitted).

## III.    THE MOTIONS IN LIMINE

### A.    Defendant's Motion to Exclude Testimony of Dr. Benjamin Johnson (Doc. No. 43)

As part of his damages, the plaintiff seeks to introduce the testimony of his former treating physician, Dr. Benjamin Johnson, to establish that the plaintiff has been diagnosed with, and treated for, Complex Regional Pain Syndrome ("CRPS"). Dr. Johnson is also anticipated to testify regarding the plaintiff's need for future medical treatment. The defendant's motion seeks to exclude both aspects of Dr. Johnson's proposed testimony.

### 1. The CRPS Diagnosis

Ingram seeks to exclude Dr. Johnson's proposed testimony about the plaintiff's CRPS diagnosis on the basis that he arrived at that diagnosis without satisfying the diagnostic criteria in the AMA Guides to the Evaluation of Impairment, Sixth Edition ("AMA Guides"). It argues that Dr. Johnson has admitted that the AMA Guides are authoritative and that he did not conform to them, specifically by failing to rule out other possible causes for the plaintiff's symptoms, including disuse atrophy, somatoform disorders, factitious disorder, and malingering. (Doc. No. 44, at 2.)

Dr. Johnson testified in his deposition that he is a medical doctor who has been licensed to practice in Tennessee since 1991. (Doc. No. 43-1, at 2–3.) His curriculum vitae reflects that he specializes in anesthesiology and pain management; he is a diplomate of the American Board of Anesthesiology and the American Board of Pain Medicine. (Doc. No. 56-1, at 3.) He has practiced, taught, lectured, and published extensively in the area of pain management for more than twenty-five years. (*Id.* at 3–45.) Dr. Johnson testified that, when Bobby Schlueter first came to him for treatment in July 2015, Schlueter had already been diagnosed elsewhere with CRPS. (*Id.* at 5.) Dr. Johnson could not recall who had made the initial diagnosis, but he believed it was contained within medical records for Schlueter that he would have received before he first saw him as a patient. (*Id.* at 7.) Dr. Johnson testified that he agreed with the diagnosis and that he himself concluded during the first office visit that Schlueter had CRPS. Dr. Johnson stated that he was familiar with the AMA Guides and agreed with defense counsel's statement that the AMA Guides are "authoritative in the diagnosis of CRPS." (*Id.* at 20.) However, he also testified that his diagnosis was not based on the AMA Guides but, instead, on the patient's history and physical examination and on Dr. Johnson's previous knowledge of the diagnostic criteria for CRPS. (*Id.* at 21.)

During Dr. Johnson's deposition, counsel for the defendant read aloud a lengthy passage from the AMA Guides, according to which "a subjective complaint of pain is the hallmark" of a CRPS diagnosis and, because "all of the associated physical signs and radiologic findings" can be the result of disuse, an extensive differential diagnosis process is necessary." (Doc. No. 43-1, at 25.) Dr. Johnson testified that he did not perform an extensive differential diagnosis process when diagnosing Schlueter with CRPS and that he did not specifically rule out disuse atrophy, somatoform disorders, factitious disorder, or malingering as a cause of the plaintiff's pain. (*Id.* at 28–31.) The defendant claims that the AMA Guides establish that CRPS is difficult to diagnose accurately and that, "when a CRPS diagnosis is made, it is probably wrong." (Doc. No. 44, at 7.) The defendant argues that, because the methodology by which Dr. Johnson arrived at his diagnosis did not conform to the AMA Guides, it is unreliable and speculative and must be excluded from evidence at trial.

In his Response to Defendant's Motion to Exclude Dr. Benjamin Johnson's Opinions (Doc. No. 69), the plaintiff cross-references his prior Response to Defendant's Motion for Leave to File Motion for Partial Summary Judgment (Doc. No. 56).[1] There, the plaintiff argued that a video-taped interview with Dr. Johnson that the plaintiff produced as part of Dr. Johnson's Expert Witness Disclosure "addresses all of the points raised by Defendant, including Bobby Schlueter's diagnosis of CRPS Type 1, how it was reached, why, and his future care needs." (Doc. No. 56, at 2.) In the video interview, Dr. Johnson explained that the plaintiff had already seen and been treated by numerous experts in various fields, who ruled out other possible explanations for the plaintiff's symptoms and converged upon a diagnosis of CRPS. The plaintiff

---

[1] The court does not condone the practice of cross-referencing a prior filing instead of actually articulating a response to the opposing party's motion in the document designated as a response to that motion, even if such response is redundant of other arguments made in a wholly different context.

further argues that the *CRPS Diagnostic and Treatment Guidelines* (4th ed. 2013) "expressly approves the diagnostic scale and measures" used by Dr. Johnson to diagnose the plaintiff's condition and that Dr. Johnson affirmed during his deposition that, in accordance with those Guidelines, (1) a forensic neuropsychologist's advice is not required to make a CRPS diagnosis; (2) Schlueter's diagnosis had been in effect for at least a year; and (3) the diagnosis had been verified by other practitioners and physicians. (Doc. No. 56, at 2.) The plaintiff asserts that the defendant offers no evidence that the AMA Guides provide the sole authoritative standard for diagnosing CRPS. Finally, he points to testimony from Dr. Thomas Rizzo, a pain specialist upon whom the defendant relies, characterizing the AMA Guides as "a resource," but not one to which he referred "on a regular basis," and that "guidelines are for everyone, and . . . they're written so that everyone, from a nurse practitioner to primary care physician who rarely sees these conditions, will think of all the other possible explanations." (Doc. No. 56-4, at 3.)

The Sixth Circuit has recognized that a treating physician is generally qualified to "provide expert testimony regarding a patient's illness, the appropriate diagnosis, and the cause of the illness even if the physician is not among the world's foremost authorities on the matters." *Thomas v. Novartis Pharm. Corp.*, 443 F. App'x 58, 61 (6th Cir. 2011) (citing *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009)). The treating physician's testimony, however, "is still subject to the requirements in *Daubert*. Before permitting a physician to testify, the district court must be persuaded that (1) the reasoning or methodology underlying his or her testimony is scientifically valid; and (2) he or she has properly applied that reasoning or methodology to the facts at issue to aid the trier of fact." *Id.* "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported

speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008). A medical doctor is generally competent to testify regarding matters within his or her own professional experience. *Gass*, 558 F.3d at 427–28 (citing *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004)).

In this case, the defendant does not dispute Dr. Johnson's qualifications as an expert in the field of pain management; he simply argues that Dr. Johnson's "methodology" for the CRPS diagnosis is not reliable. The sole basis for this argument is that Dr. Johnson himself did not go through a differential diagnosis process as recommended by the AMA Guides. Dr. Johnson did, however, explain what symptoms led to the diagnosis, why he reached that diagnosis, and the basis for his reliance on previous specialists to rule out other explanations for the plaintiff's symptoms. Under *Daubert*, experts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as "the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline." *Daubert*, 509 U.S. at 592; *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury."). The defendant has not shown that Dr. Johnson was unreasonable in relying on other practitioners to rule out other causes for the plaintiff's condition. Certainly, Dr. Johnson's failure to expressly rule out other potential causes for the plaintiff's symptoms and his reliance on the prior diagnosis are issues that the defendant can explore through cross-examination at trial, but his decision not to conduct a differential diagnosis goes to the weight of his testimony, not its admissibility. Regardless of whether the diagnosis is correct, the defendant has not established that it is speculative or outside the scope of matters generally within Dr. Johnson's field of expertise.

Dr. Johnson will be permitted to give an opinion regarding his diagnosis of the plaintiff's condition as CRPS.

### 2. *The Plaintiff's Future Treatment*

A treating physician is generally qualified to testify about a patient's diagnosis, treatment, and prognosis, including the future course of treatment, so long as the testimony is based on personal knowledge and the doctor's history, treatment and examination of the patient. *See, e.g.*, *St. Vincent v. Werner Enters., Inc.*, 267 F.R.D. 344, 345 (D. Mont. 2010); *Gibson v. CSX Transp., Inc.*, No. 1:07-CV-156 (FJS/RFT), 2008 WL 11355393, at *3 (N.D.N.Y. Nov. 3, 2008) ("[P]rognosis on future medical care is one of the functions of a treating physician in the course of the care and treatment of a patient." (citation omitted)); *Boudreaux v. J.P. Morgan Chase & Co.*, No. CIV.A. 07-555, 2007 WL 4162908, at *1–3 (E.D. La. Nov. 21, 2007) (denying motion *in limine* to exclude treating physician's testimony regarding the plaintiff's expected future treatment, including the likelihood that she would need to undergo surgery). The Sixth Circuit also recognizes, however, that "speculative medical testimony is not admissible in Jones Act suits." *Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 964 (6th Cir. 1990).

On May 29, 2018, Dr. Johnson emailed plaintiff's counsel a list of future medical treatment he believed the plaintiff might need. (Doc. No. 43-1, at 42, 70.) Among other modalities, the anticipated treatments included "[s]pinal cord stimulation trial and possible implant," left knee arthroscopic surgery, occupational therapy, medications, and a personal care assistant. (*Id.* at 70–71.) The defendant moves to exclude Dr. Johnson's testimony that the plaintiff will need these treatments in the future on the grounds that Dr. Johnson admitted that he was speculating about whether the plaintiff would ever need the specified treatments or medications in the future. (*See* Doc. No. 44, at 9.) In response, the plaintiff concedes that left

knee arthroscopic surgery is not needed at this time but argues that the plaintiff's need for the other recommended modalities of treatment is not speculative.

In response to direct questioning from defense counsel, Dr. Johnson agreed that the question of whether the plaintiff may need some of these treatments in the future is "speculative." (*See, e.g.*, Doc. No. 43-1 at 35, 36, 40, 45.) The court is not persuaded, however, that Dr. Johnson understood the word as a legal term of art. Considered in context, Dr. Johnson's testimony indicates that he has formed a medical opinion that the plaintiff will continue to need treatment for pain management going forward indefinitely, even though the development of the plaintiff's symptoms and, thus, the precise form of that treatment remain uncertain. Despite that uncertainty, Dr. Johnson is clearly qualified to provide his opinion as to Schlueter's anticipated course of treatment. Under the circumstances presented here, the degree of uncertainty goes to the weight of the testimony rather than its admissibility.

The exception is that Dr. Johnson will not be permitted to testify regarding the plaintiff's treatment for other conditions diagnosed by other practitioners that have not been shown to be related to the CRPS diagnosis and regarding which Dr. Johnson has no personal knowledge.[2] In addition, because the plaintiff concedes that it is not needed at this time, Dr. Johnson's testimony regarding the potential need for arthroscopic knee surgery will also be excluded. Subject to these exceptions, the defendant's motion to exclude Dr. Johnson's testimony will be denied.

---

[2] The list of medications compiled by Dr. Johnson may have included some medications prescribed by other practitioners. In response to counsel's question about whether all of those medications were because of the CRPS or were "on here for other things like high blood pressure and things of that nature," Dr. Johnson responded: "Well, to some degree it depends on how you look at it. If pain can cause high blood pressure, then it may be related." (Doc. No. 43-1, at 44.) In other words, he clearly had not developed an opinion that the plaintiff had high blood pressure caused by pain. To the extent there are medications on the list that have not actually been prescribed by Dr. Johnson to treat the plaintiff's pain symptoms, Dr. Johnson did not indicate that he had sufficient personal knowledge to testify about the ongoing need for those medications.

**B.     Defendant's Motion to Exclude Jay Marsh's Opinions Regarding Past and Future Medical Expenses (Doc. No. 45)**

The plaintiff has retained the services of Robert E. "Jay" Marsh, an economist, to provide an estimate of the value of past and future economic losses the plaintiff has or will suffer as a result of the accident, including the cost of past "medical expenses" and the present value of the cost of future "medical expenses." In Marsh's supplement expert report (which is in the form of a letter to plaintiff's counsel) dated April 2, 2019, Marsh opined that the plaintiff had incurred past losses in that category valued at $132,113.52, and he calculated the present value of future losses to be $687,910.02, for total "medical expenses" of $820,023.54. (Doc. No. 70-5, at 4, 12–14 (Table 4).) Marsh explained that this figure was based on the amount of time that Schlueter's wife, Rebecca Schlueter, had spent since the injury providing home health services to her husband,[3] the expected number of hours of home health services Schlueter was expected to need going forward, and the value of those services. (*Id.* at 4.) Marsh explained during his deposition that he had not yet been provided figures concerning Schlueter's other medical services and had not included those in his calculations. (*See* Doc. No. 70-3, at 7 ("Q. Okay. So have you sort of stayed out of the medical end, other than this 40 hours that Ms. Schlueter devotes to her husband? Is that correct? A. Correct.").) He also confirmed that he had not relied on any expert medical testimony, medical bills, or medical evidence in preparing his report. (Doc. No. 45-1, at 4–5.)

The defendant's motion *in limine* seeks to exclude Marsh's opinion regarding the value of the home health aide services that, in the past, have been provided to the plaintiff by his wife and the present value of the cost of such services in the future, on the basis that the opinion is not

---

[3] Rebecca Schlueter worked as a certified nurse's aid for twenty years before retiring in November 2018 to take care of her husband. (July 24, 2019 R. Schlueter Dep., Doc. No. 70-2, at 3; Oct. 24, 2017 R. Schlueter Dep., Doc. No. 70-2, at 7.)

based on actual *medical* evidence. The defendant, in fact, is quibbling with Marsh's characterization of home health aide services as medical. The court agrees that this category of expenses is not, strictly speaking, medical, but it appears that Marsh characterized it thus largely as a matter of convenience. The defendant has not actually argued that this form of damages is not recoverable in a Jones Act case. Generally, the Jones Act permits the recovery of pecuniary losses. *See, e.g.*, *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2285 (2019) ("The Jones Act 'limits recovery to pecuniary loss.'" (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)).

Because the defendant has not argued that this form of damages is not allowable under the Jones Act or that it does not qualify as pecuniary, the motion will be denied.

## C.     Plaintiff's Motion to Exclude Earl Darst from Offering Certain Expert Testimony (Doc. No. 47)

The plaintiff alleges that he was injured while trying to tighten a winch on one of the barges in the tow of the M/V Sarah L. Ingram. He explains that barges being towed are connected to each other and to the tow by steel wires. "The wires are attached to winches or ratchets, and the system is configured such that, when the winches or the ratchets are tightened, the wires pull the barges together so that they can be secured to one another." (Doc. No. 48, at 2 (internal citations to the record omitted).) He describes the working of a winch as follows:

> A winch consists of a drum around which the wire is wrapped. A winch wheel turns the drum to wrap more or less wire, thereby tightening or loosening the wire. This is accomplished by a system of gears between the drum and the winch wheel. A winch handle is used to turn the drum to tighten the wires up to a point, and the winches are then further tightened by the use of a pipe, called a cheater bar. The cheater bar is used to perform the final tightening. It is placed on the winch handle connected to the winch wheel. The operator, holding the cheater pipe and standing beside the winch, exerts force on the pipe with their arms in a downward motion. As they do this, the winch wheel turns, and the gears tighten. A "dog," which is a cog, engages the gears, thereby keeping the load from releasing tension. Each time the dog engages, it makes an audible "clicking" sound.

(*Id.* at 3 (internal citations to the record omitted).)

The plaintiff alleges that, on the night of the accident, it was very cold and icy. (Schlueter Dep., Doc. No. 48-3, at 3, 4.) He and his supervisor, second mate William Meek, were tightening winches. Regarding the particular winch that gave way, causing the accident in question, Schlueter testified that both he and Meek had cleaned the ice off of it by banging it with the cheater bar, and both of them inspected it. (*Id.* at 10, 13; *see also* Meek Dep., Doc. No. 48-2, at 13–14 (testifying that he did not recall whether he cleaned the ice off the winch but that he would have inspected it).) Schlueter then proceeded to try to tighten the winch. He placed the "dog" in gear, slid the cheater bar onto the winch handle, placed both hands on the cheater bar at about chest height, and placed pressure on it. (Doc. No. 48-3, at 13–17.) He claims that, as soon as he did, the dog slipped out of gear, which caused the winch to give way, which caused Schlueter to fall suddenly onto his right knee. (*Id.* at 17–18.) Schlueter testified that it was "[p]robably ice in the gears" that caused the dog to slip. (*Id.* at 18.) Even though he and Meek had inspected the gears and removed as much ice as they could, it was dark, and they could not see very well. (*Id.*)

The defendant seeks to enter into evidence the expert opinion of Earl Bruce Darst, a river boat captain and master/pilot. Darst proffers an opinion regarding what caused the dog to slip and, more particularly, whose responsibility it was to ensure that it remained in gear. On this issue, his report states two opinions, based on two different possible factual scenarios. The first is premised on Schlueter's statement that the accident occurred because the dog slipped out of gear due to ice in the cog. In this scenario, according to Darst,

> [i]t was Mr. Schlueter's responsibility to ensure that the cog was free of ice. He was well aware of the risks ice in the cog presented, and if his failure to clear the cog of ice was the cause of the incident, then he failed in his responsibility to make sure that the cog was clear and thus failed to exercise reasonable care for his own safety at the time of the incident.

(Darst Report, Doc. No. 48-1, at 7–8.) In the alternative, Darst states that, if the accident was caused instead by the dog's "slipping because it was not firmly seated in the cog, then Mr. Schlueter failed in his responsibility to make sure that the dog was properly seated before attempting to tighten the winch and thus failed to exercise reasonable care for his own safety at the time of the incident." (*Id.* at 8.) During his deposition, in response to questioning by plaintiff's counsel, Darst further opined that Meek was *not* responsible for ensuring that the dog was properly seated, since he was not the person tightening that particular winch. (Doc. No. 48-5, at 2–5.)

The plaintiff argues that Darst should be barred from offering the first opinion on the ground that it does not involve specialized knowledge and will invade the province of the jury, insofar as the "jury does not need specialized knowledge to determine any comparative fault on Schlueter's fault under this factual scenario." (Doc. No. 48, at 7.) He argues that the second opinion should be excluded because the factual scenario upon which it is premised (that Schlueter did not ensure that the dog was properly seated in the gear) is not supported by any evidence in the record. Finally, he argues that Darst's deposition testimony expressing his opinion that it was not Meek's responsibility to clear the ice in the winch amounts to an inadmissible conclusion of law.

For the reasons discussed below, this motion will be denied.

### 1.    Darst's Opinion "if Schlueter Failed to Clear the Ice" (Doc. No. 48, at 7)

The plaintiff states that "Darst's opinion regarding Schlueter's failure to exercise reasonable care for his safety if the dog slipped because he failed to clear the ice does not comply with Rule 702(a)," because it does not involve specialized knowledge. (Doc. No. 48, at 7.) The defendant, in response, argues that Darst's opinion that the plaintiff was responsible for clearing

the ice should not be excluded, because this is an arena in which the expert's specialized knowledge will assist the trier of fact. Specifically, he argues, "[i]t is extremely unlikely that any juror who would be chosen to serve in this case has ever been on a barge being towed down a river, has ever operated (or even seen) a winch on a barge, knows what a dog, cog, or cheater bar is, or otherwise has any knowledge whatsoever of how the component parts of a winch operate in conjunction with one another." (Doc. No. 66, at 7.) Ingram further contends that, without expert opinion in this arena, "the jury would be unable to make an informed decision on whether the Plaintiff acted reasonably in connection with his inspection and operation of the winch." (*Id.*)

Ingram points out that both parties have designated experienced towboat captains as experts in this case, "to assist the jury in understanding precisely what took place at the time of the incident at issue and in determining whether the Plaintiff's actions constitute a failure to comply with his responsibilities and duties as a deckhand." (Doc. No. 66, at 7.) The plaintiff's own expert, Samuel Schropp, like Darst, intends to offer an opinion addressing the reasonableness of the plaintiff's actions, though Schropp, contrary to Darst, intends to testify that Schlueter "was exercising reasonable care for his own safety," that he was "perform[ing] his duties as carefully as possible on February 7, 2014," and that his actions were "reasonable and prudent." (Schropp Dep. Ex. 4 at 5–7, 9–10.) Darst proposes to offer testimony on exactly the same issues, though he draws the opposite conclusions, but the plaintiff seeks to exclude Darst's opinions as being within the knowledge of the average juror.

In *Salem v. U.S. Lines Co.*, 370 U.S. 31, 34 (1962), a Jones Act case, the Supreme Court considered whether the district court abused its discretion in excluding expert evidence on the issue of the shipowner's responsibility to equip the ship with necessary and feasible safety devices, specifically, "'railings or other safety devices' at the crow's-nest platform." The Court

observed that:

> expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

*Id.* at 35 (internal quotation marks and citation omitted).

One district court applying *Salem* excluded expert testimony in a slip-and-fall case regarding whether it was "reasonable and foreseeable" that the plaintiff would use a sidewalk as unnecessary, because the proposed expert, a mechanical engineer, possessed no specialized knowledge as to that issue, and "the jurors' own experiences [would] permit them to draw their own conclusions." *Garrity v. Wal-Mart Stores E., Ltd. P'ship*, 288 F.R.D. 395, 401 (W.D. Ky. 2012). The court also held, however, that the same expert would be permitted to testify that the defendant had failed to exercise reasonable care in maintaining its sidewalks in a safe condition. *Id.* at 401-03. As the court stated:

> trial courts routinely allow expert testimony in slip-and-fall cases when it helps the jury understand the evidence in question. Additionally, trial courts routinely allow experts to testify on industry standards, ordinances, and policies. In this case, if the jury determines that Wal–Mart owed a duty to Mr. Garrity, it will be required to evaluate the parties' comparative fault and determine whether it was reasonable for Wal–Mart to make no attempt at clearing the sidewalk. The Court finds that in conducting this evaluation, the jury would be assisted by Mr. Vidal's testimony as to industry standards, Owensboro's ordinances, and Wal–Mart's policy.

*Id.* at 402 (internal citations omitted).

In this case, Darst proposes to testify about industry standards and practices and the functioning of devices in an arena with which the jury can be expected to have little familiarity. The court finds that expert testimony offered by Darst, like that offered by the plaintiff's proposed expert on the same topic, will assist the trier of fact to understand matters that are

generally outside the knowledge of the average lay juror. The motion to exclude Darst's testimony on whether it was Schlueter's responsibility to clear the ice will be denied.

> ### 2. Darst's Opinion if "Schlueter Failed to Seat the Dog Properly" (Doc. No. 48, at 8)

The plaintiff argues that Darst's opinion that, if the dog slipped because Schlueter did not seat it properly, he failed to exercise reasonable care, should be excluded because it is not based on sufficient facts. More specifically, he insists that the plaintiff testified that he did properly seat the dog and that there is no evidence to the contrary. He points to Schlueter's response to the question of whether he thought the gears on the dog had caught:

> I think the dog was in the gear, but I think there was ice or something in there, as well, and once I put that pressure to that gear that dog wasn't far enough as it's supposed to be or there could have been ice coating that gear at a fine state and it just popped it right out.

(Doc. No. 48-3, at 20.)

Ingram argues that this testimony is equivocal at best and that it amounts simply to the plaintiff's theory of what he believed happened. It argues that the plaintiff also testified that he and Meek both checked for ice and cleared it, which gives rise to a possible inference that, contrary to his own theory, there was no ice in the gear. Darst was asked to agree that there was "no evidence that [Schlueter] didn't seat the dog properly," to which he responded: "There's a lot of evidence that he didn't seat the dog properly. It slipped." (Darst Dep., Doc. No. 66-2, at 8.) He also testified that it is common for a dog to slip because it is not seated properly and that "slippage of the dog for this reason is probably the most common cause and occurs in all types of weather conditions and during all seasons." (Doc. No. 66-2, at 4.)

The plaintiff's only basis for seeking to exclude Darst's testimony on this particular issue is that the evidence does not support a conclusion that Schlueter failed to ensure that the dog was seated properly in the gear. The court finds that the evidence is such that a jury could draw that

conclusion and that Darst's opinion that the accident may have occurred because the plaintiff failed to ensure that the dog was seated properly is not based on pure speculation. As stated above, any weakness in the factual basis underlying an expert's opinion generally bears on the weight, as opposed to the admissibility, of the evidence. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" (*quoting United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993))); *Cooke*, 991 F.2d at 342 ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.").

Because Darst's theory is not based on guess work or speculation, any challenge to the factual support for it goes to its weight rather than its admissibility. The motion to exclude this opinion will be denied as well.

### 3. Darst's Opinion that Meek Had No Responsibility to Ensure that the Dog Was Properly Seated

Finally, the plaintiff seeks to prevent Darst from testifying to his opinion that Meek, the plaintiff's supervisor, had no particular responsibility to ensure that the dog was free of ice. The plaintiff argues that this testimony must be excluded because it communicates a legal standard, which is the court's job.

Darst's opinion that Meeks did not have any responsibility to ensure that the dog was free of ice is admissible for the same reason that his testimony that Schlueter did have such a responsibility is admissible: it will assist the jury in understanding industry practices and

standards in a field that will likely be unfamiliar to the jury.

Moreover, contrary to the plaintiff's assertion, the proffered testimony does not communicate a legal standard. The Sixth Circuit has recognized that an expert's testimony that conveys an opinion about what might ultimately be considered a legal issue is not objectionable solely on that basis. *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (quoting Fed. R. Evid. 704). Instead, "[t]he problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. This invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." *Id.* (internal quotation marks and citations omitted). Thus, the court determined that, in the exercise of their discretion, the district courts are to "determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." *Id.* at 151. The cases cited by the plaintiff stand generally for the same proposition—that the court properly excludes expert testimony that employs terms with specialized legal meaning. *See, e.g.*, *Shahid v. City of Detroit*, 889 F.2d 1543, 1547–48 (6th Cir. 1989) (holding that the trial court did not err in excluding an expert's testimony that the defendants were negligent, since such a conclusion amounted to a legal conclusion); *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 709 (2d Cir. 1989) (expert's testimony that "the railroad was negligent" was prejudicial and should not have been allowed, since "negligence" is a legal conclusion); *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (expert should not have been permitted to testify that the defendant was "deliberately indifferent" to its citizens' welfare, because "'deliberate indifference' is a legal term").

In the testimony to which the plaintiff points, Darst uses such terms as "responsibility," "ultimate responsibility," "failure in his duties," "normal operations," "failure to take necessary

precautions," and the like. (*See* Darst Dep. 114–17.) He does not use terms like negligence, comparative negligence, or deliberate indifference. Because his testimony does not improperly incorporate legal terminology, the plaintiff has not established that it is subject to exclusion under *Torres*. *Accord Medlin v. Clyde Sparks Wrecker Serv., Inc.*, 59 F. App'x 770, 771, 778 (6th Cir. 2003) (holding that the district court did not abuse its discretion by allowing the plaintiff's expert to testify that the defendants acted without reasonable care).

The motion to exclude Darst's testimony on whether it was Meek's responsibility to clear the ice will also be denied.

**D.      Plaintiff's Motion *in Limine* to Exclude Defendant's Proposed Expert Witness Testimony of Todd Didion (Doc. No. 52)**

The defendant proposes to offer the testimony of Todd Didion, licensed physical therapist assistant ("PTA") with STAR Physical Therapy, to testify regarding the result of his functional capacity evaluation ("FCE") of the plaintiff in November 2014 and his opinion that the plaintiff is capable of performing work at the sedentary level of exertion. (*See* Didion Dep., Doc. No. 52-1, at 4.) The plaintiff's motion *in limine* seeks to bar Didion from testifying that the plaintiff was capable of performing sedentary work.

The plaintiff does not take issue with Didion's qualifications as a PTA or dispute Didion's testimony that he has been a licensed PTA for over 20 years, has been performing FCEs for 15 to 16 years, holds various FCE certifications, and is the Industrial Rehab Coordinator for STAR Physical Therapy, in which capacity he performs FCEs himself but also supervises other employees who perform FCEs. (Didion Dep., Doc. No. 67-1, at 2–7.)

Instead, the plaintiff argues that Didion, because he is a PTA rather than an actual physical therapist ("PT"), cannot be deemed an "expert" and, further, that his opinions, insofar as they are derived from the FCE, are inadmissible as a matter of law because the FCE itself was

"illegal." (Doc. No. 52, at 2, 4.) The "law" upon which the plaintiff apparently relies for this assertion is actually a rule promulgated by the Tennessee Board of Physical Therapy (the "Physical Therapy Rules"). Physical Therapy Rule 1105-01-.02(2)(a) requires generally that a PTA perform services only under the supervision of a licensed PT. The PT herself must perform any initial evaluation and develop a written treatment plan, document and perform re-evaluations and modifications of the treatment plan, supervise the PTA at a site no more than 60 miles from the PT, perform the discharge evaluation, and write the discharge summary. Physical Therapy Rule 1105-01-.02(2)(1)–(4). The plaintiff maintains that Didion's FCE was "illegal" because a licensed PT did not perform the FCE, supervise Didion as he performed the FCE, or handle the plaintiff's discharge. (Doc. No. 52, at 2; *see also* Didion Dep., Doc. No. 52-1, at 5–7, 10–12; Schlueter Aff., Doc. No. 52-2 ¶¶ 1–4.)

Based on the assertions that Didion is not an expert and that the FCE was "illegal," the plaintiff argues that Didion's opinion does not qualify as "expert" opinion and is "no different from what a lay person or juror could have determined on [his] own"; is *prima facie* unreliable because it is contrary to Tennessee law for a PTA to conduct an FCE; and lacks scientific basis. (Doc. No. 52, at 2–3.) In addition, he argues that it should be excluded because it "assesses a witness's credibility and further ignores contrary proof"—specifically the findings of several physicians, the Social Security Administration that the plaintiff is not able to work, and the plaintiff's CRPS diagnosis—"and, therefore, amounts to a 'fact filter' or selective 'fact-finder.'" (*Id.* at 3.)

In response, Ingram maintains that nothing in the Physical Therapy Rules, or any other source of Tennessee law, requires a PT to perform an FCE, nor does the Rule dictate that Didion, as a PTA, is unqualified to do so. It argues that Didion's testimony and background establish that

he was fully qualified and capable of performing FCEs. In addition, the defendant argues that the evidence does not establish a violation of the Physical Therapy Rules. Didion testified in his deposition that he was supervised by PT Amy Melton, who was present at the clinic when the FCE was performed and who signed the FCE as the supervising PT. (Doc. No. 67-1, at 12–14.) Rule 1105-01-.02(2)(a)(3) provides that a PT may supervise a PTA as long as the PTA is delivering services at a site no more than 60 miles or one hour from the PT, meaning that the Rule does not require that the supervising PT be in the room or even at the clinic where the PTA is providing services in order to provide supervision. The defendant also argues that, insofar as the plaintiff is taking issue with the fact that a PT did not perform an initial evaluation and develop a treatment plan, that portion of the rule did not apply under the circumstances, because the plaintiff was referred for a one-time FCE and not for the purpose of ongoing physical therapy treatment. Likewise, it would appear that no discharge summary would be required. In any event, although the plaintiff questioned Didion at his deposition about a discharge summary, no discharge summary has been introduced into the court's record. In short, the defendant argues that the FCE was not "illegal" under the law and that, even if there were some technical violation of the Physical Therapy Rules, it would not invalidate the FCE or preclude Didion from testifying about it. (Doc. No. 67, at 5–6.)

The court finds that the plaintiff has failed to establish that Didion is not qualified as an expert under Rule 702 by virtue of his specialized knowledge, skill, experience, training, and education. The plaintiff's assertion that Didion's testimony is the product of unreliable principles and methods is based solely on his claim that the FCE was "illegal" under the Physical Therapy Rules. Didion's testimony establishes that it was not. He testified that he was supervised by PT Amy Melton and that she was present in the clinic when he performed the plaintiff's FCE.

Schlueter's statement that Amy Melton did not conduct or participate in conducting the FCE is irrelevant in light of the fact that nothing in the Physical Therapy Rules precludes a PTA from conducting FCEs. Moreover, Schlueter is not competent to testify regarding whether Didion was working under Melton's supervision. Even if the plaintiff were competent to testify about that issue, at best he raises a disputed issue of fact as to how closely Didion was supervised. Moreover, even if the plaintiff were able to establish a technical violation of the rules, he has cited no law to support his assertion that such a violation would invalidate the FCE.

Insofar as the plaintiff argues that Didion's opinion should be omitted because it contradicts and ignores contrary evidence in the record, the fact that Didion's opinion is disputed by other evidence in the record—including medical evidence that he is not capable of performing work at any exertional level—goes to the weight to be accorded Didion's testimony rather than its admissibility. Didion's opinion that the plaintiff is capable of sedentary work was not premised on guesswork or speculation but upon Didion's own evaluation of the plaintiff. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530.

The motion to exclude Didion's testimony will be denied.

### E.     Plaintiff's Motion *in Limine* to Exclude Defendant's Proposed Expert Witness Testimony of George A. Barrett (Doc. No. 51)

George A. Barrett is a forensic economist whom the defendant intends to have testify regarding the plaintiff's annual earnings lost as a result of the accident. According to the plaintiff, Barrett's testimony "includes opinions as statements of fact, such as 'Mr. Schlueter's post-injury annual earnings [would] be $21,255.00 in 2018" and that the plaintiff was "capable of sedentary work." (Doc. No. 51, at 1 (quoting Barrett Report, Doc. No. 51-1, at 3).) The plaintiff argues that these opinions, "as stated," must be excluded because they "are devoid of any scientific, technological or specialized knowledge identified as their basis, apart from his

vague reference to medical experts or his unspecified and undated records or internet data . . . of the sort easily understood by a lay juror." (Doc. No. 51, at 1–2.) He argues that the testimony is excludable because it (1) skews or omits facts; (2) is no different from what a lay jury could determine; (3) assesses a witness's credibility and ignores contrary testimony and, therefore, amounts to a "fact filter"; (4) is unreliable, unhelpful, and lacks foundation; and (5) lacks scientific basis. (*Id.* at 2–3.)

Barrett's report, in the form of a letter to defense counsel dated May 9, 2019, identifies the records Barrett reviewed to form his opinions, and he also states that he understands "from the available records that medical expert opinions have been rendered which recommend that Mr. Schlueter would be capable of working in jobs at the sedentary physical demand level." (Doc. No. 51-1, at 2.) Barrett took into account the plaintiff's educational background—he has a GED—and his past work as a manual laborer. In light of these factors, Barrett concluded that the plaintiff has minimal transferable job skills and that his opportunities for sedentary labor would be fairly limited. (*Id.*) Based on Barrett's review of labor statistics for various occupations, Barrett opines that, if the plaintiff had worked at a low-skill sedentary office job in 2018, his annual income would have been approximately $21,255. (*Id.* at 3.)

The plaintiff's objection is that Barrett's economic conclusions are premised upon a presumption that the plaintiff was capable of performing work at the sedentary level, which the plaintiff asserts is supported only by the opinion testimony of PTA Todd Didion, which the plaintiff also seeks to exclude. For the reasons set forth above, the court will not exclude Didion from opining that the plaintiff is capable of sedentary work, nor is it improper for the defendant to engage an economist to testify as to what the plaintiff's earnings would have been if he had actually been engaged in sedentary work in 2018. Any objection to the factual basis for Barrett's

opinion goes to the weight to be accorded the evidence rather than to its admissibility. The motion to exclude Barrett's testimony, too, will be denied.

## IV. CONCLUSION AND ORDER

For the reasons stated above:

(1) Defendant's Motion to Exclude Dr. Benjamin Johnson's Opinions Regarding Diagnosis of Complex Regional Pain Syndrome and Certain Elements of Future Medical Treatment (Doc. No. 43) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** to the extent that Dr. Johnson will not be allowed to testify that the plaintiff will need arthroscopic knee surgery in the future or about his future need for prescription medications that have in the past been prescribed by other practitioners for conditions unrelated to CRPS; it is **DENIED** in all other respects.

(2) Defendant's Motion to Exclude Jay Marsh's Opinions Regarding Past and Future Medical Expenses (Doc. No. 45) is **DENIED**.

(3) Plaintiff's Motion to Exclude Earl Darst from Offering Certain Expert Testimony on Behalf of the Defendant (Doc. No. 47) is **DENIED**.

(4) Plaintiff's Motion *in Limine* to Exclude Defendant's Proposed Expert Witness Testimony of Todd Didion at Trial (Doc. No. 52) is **DENIED**.

(5) Plaintiff's Motion *in Limine* to Exclude Defendant's Proposed Expert Witness Testimony of George A. Barrett at Trial (Doc. No. 51) is **DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge