IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BOBBY SCHLUETER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 3:16-cv-02079 |
| | )    Judge Aleta A. Trauger |
| INGRAM BARGE COMPANY, | ) |
| | ) |
|     Defendant. | ) |

<u>MEMORANDUM and ORDER</u>

Before the court is the plaintiff's Motion *in Limine* to Exclude Defendant's Proposed Expert Witness Testimony of Scott Giles, D.O. (Doc. No. 83), under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), on the basis that Giles does not qualify as an "expert" and that the testimony he proposes to offer is speculative and unreliable. For the reasons set forth herein, the motion will be granted.

I.    **BACKGROUND**

As previously explained in the Memorandum and Order addressing five other motions *in limine* by both parties to exclude each other's experts, this case arises out of an injury suffered by plaintiff Bobby Schlueter on February 7, 2014, while he was a member of the crew of the M/V Sarah L. Ingram, a vessel owned and operated by the defendant, Ingram Barge Company ("Ingram"). Schlueter filed the Complaint initiating this action on August 8, 2016, asserting claims under the Jones Act, 46 U.S.C. § 30104, and the general maritime law of the United States. (Doc. No. 1.) Schlueter alleges that, while working on the Sarah L. Ingram one cold and icy night, he fell, suffering injuries to his knee and lower back, and subsequently developed Complex Regional Pain Syndrome ("CRPS"). At issue in the case are questions of fault,

causation, and damages.

As relevant to the present motion, Ingram seeks to introduce the testimony of Scott Giles, a doctor of osteopathy, to refute the scope of the plaintiff's damages and to suggest to the jury that the plaintiff is magnifying his symptoms. The plaintiff seeks to exclude Dr. Giles' testimony.

According to his deposition testimony and attached Curriculum Vitae, Dr. Giles has been an emergency room physician since approximately 1990. (Doc. No. 83-1, Giles Dep. 9;[1] Doc. No. 83-2, at 2–4.) According to his medical notes, Dr. Giles was the attending physician on duty at the Harton Regional Medical Center Emergency Department when Bobby Schlueter presented, at about 1:30 in the afternoon on March 15, 2017, with complaints of right arm pain and right leg pain. (Giles Dep. 9–10, 14–15.) The medical record indicates that Schlueter arrived via wheelchair. (*Id.* at 14.) Giles testified, also based on the medical record, that Schlueter stated that he had been at his chronic pain appointment that day getting a ketamine infusion when he began having difficulty moving his right arm and right leg due to pain. (*Id.* at 15.)

Dr. Giles conducted a general examination of Schlueter, which included a neurological assessment. (*Id.* at 17–18.) In connection with the neurological examination, Dr. Giles wrote: "When testing motor strength in his legs, patient pushes down firmly with right leg to raise left leg but demonstrates no effort in his left leg when asked to raise his right leg. This finding makes his claim of weakness and lack of use of right leg very suspect for malingering." (*Id.* at 18.) Dr. Giles described the test he performed to make this assessment as follows:

> If you're trying to raise your leg off of a bed, you actually counter balance with the other leg. And so if you're not making an effort to raise your leg, you're not

---

[1] Because of the way the plaintiff filed this exhibit, the CM/ECF pagination and the court reporter's pagination of the deposition transcript are not consistent with each other. The deposition pagination, rather than the CM/ECF pagination, is used herein.

going to counter balance with the opposite leg.

> So in this case, he told me he could not move his right leg. So I asked him to move his left leg and he pushed down with the right leg on my hand with the heel to lift the left leg. When I asked him to lift his right leg, he made no effort to push down with the left leg, which led me to believe that he was not being entirely truthful in his description of his condition.

(*Id.* at 92.) More particularly, he explained that, as the patient was lying on the examination table, Dr. Giles placed his hands under the patients' heels, so he could feel with his hands whether the patient was pressing down or lifting up with either foot. (*Id.* at 93.)

Asked whether this test had a name, he stated, "I don't know that there's a specific name to that test. That is simply something that was. . . taught to us in training," during his osteopathy internship, sometime in the late 1980s. (*Id.* at 54–55; *see also id.* at 11–12; Doc. No. 83-2, at 3.) He could not answer whether any peer-reviewed articles would approve the test for rebutting a finding of CRPS, again stating that he did "not know that this test has ever been given . . . any type of name." (*Id.* at 56.) It was "simply a physical examination to determine whether or not [the patient] was demonstrating the symptom he complained of." (*Id.* 57.) Dr. Giles later testified that he could probably find a name for the test if he were given an opportunity to research it online, noting that "there are a lot of names of things out there" that he had forgotten. (*Id.* at 79.)

Dr. Giles testified that Schlueter was at the medical center for several hours and received medication. When the doctor went to reevaluate Schlueter around 5:30, he was "not in his room. Staff report he walked out. Less than 30 minutes before this he still claimed he could not move his right leg due to pain." (*Id.* at 20.) Dr. Giles testified that he did not see Schlueter leave the premises that day, but he was told by a registered nurse, Brett Jackson, that "he left, he walked out." (Giles Dep. 22.) Dr. Giles believed that the nurse meant the statement literally rather than figuratively, but he also assumed that Schlueter "did not present in his wheelchair but, instead, had been placed in a wheelchair" that belonged to the hospital, while he was at the pain center,

just down the hall from the Emergency Department. (*Id.* at 29.) That is, Dr. Giles had no knowledge of whether Schlueter arrived in his *own* wheelchair and would have left the same way. (*Id.*) He reiterated that he did not personally observe Schlueter walk out or leave. (*Id.* at 30.)

The plaintiff moves to exclude Dr. Giles' testimony, particularly any testimony regarding the results of the neurological test, his assessment of the plaintiff as possibly malingering, and the nurse's report that the plaintiff "walked out" of the Emergency Department on March 15, 2017, on the basis that Dr. Giles is not qualified to make a neurological assessment and did not personally witness the plaintiff leave the Emergency Department. (Doc. No. 83, at 5.) In its Response, Ingram contends generally that Dr. Giles was qualified by training and experience to evaluate and treat the plaintiff for complaints of arm and leg pain and weakness and that medical records "routinely contain vast amounts of hearsay." (Doc. No. 84, at 5.)

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court construed Rule 702 as granting district courts, acting as "gatekeepers," "discretion in

determining whether . . . a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007). The Supreme Court has provided a non-exhaustive list of factors that lower courts may consider in assessing reliability: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Daubert*, 509 U.S. at 593–94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–50 (1999). The Sixth Circuit has approved the use of an additional factor: whether the expert prepared his or her opinion "solely for purposes of litigation." *Wilden v. Laury Transp., LLC*, 901 F.3d 644, 649 (6th Cir. 2018) (quoting *Johnson*, 484 F.3d at 434). The court's gatekeeping role is not limited to expert testimony based on scientific knowledge but, instead, extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. *Kumho Tire*, 526 U.S. at 147.

Whether the court applies any particular *Daubert* factor to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150 (citation omitted). Any weakness in the underlying factual basis generally bears on the weight, as opposed to the admissibility, of the evidence. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citations omitted).

## III.    DISCUSSION

The plaintiff argues that:

(1) Dr. Giles is not a neurologist and is not qualified to give a neurological opinion;

(2) the neurological "test" administered to Schlueter "lacked reliability, peer-review [or] general acceptance" and did not even bear a name (Doc. No. 83, at 2);

(2) the medical record indicates that Schlueter was not complaining of "paralysis" but pain and weakness resulting from the pain (*id.*), making the particular test irrelevant;

(3) Dr. Giles' test "had never been used on another patient by any physician, to his knowledge" (*id.* at 3);

(4) because Dr. Benjamin Johnson referred the plaintiff to a neurologist, not a doctor of osteopathy, Dr. Giles "was not the appropriate or designated physician" to treat Schlueter on March 15, 2017 (*id.*);

(5) Dr. Giles admitted that Schlueter's symptoms were consistent with CRPS, which was Schlueter's admitting and discharge diagnosis on March 15, 2017, but he does not treat CRPS and did not perform any CRPS tests on the plaintiff;

(6) Dr. Giles did not read or follow CRPS guidelines prior to treating the plaintiff but concedes that they are authoritative in CRPS care;

(7) Dr. Giles denies reviewing the plaintiff's medical records prior to treating him, even though his treatment notes state that he had received "old medical records" prior to seeing him (*id.* at 3 (citing Giles Dep. 82 and Ex. D002663));

(8) Dr. Giles denied that the plaintiff's wife was present during his care, even though medical records indicate that his "family" was present (*id.* (citing Giles Dep. 29, 30 and Ex. 2, D002663)); and

(9) Dr. Giles did not personally observe the plaintiff leave the hospital.

With regard to these arguments, from the context it is fairly clear that the reason Dr. Giles saw and treated the plaintiff is because he presented at the Emergency Department. Emergency Department physicians are generally expected to specialize in emergent care, not neurology. At the same time, it is a matter of common knowledge that emergency room physicians and general practitioners can perform neurological assessments. The fact that Dr. Giles is not a neurologist is somewhat beside the point. In addition, it is not clear that Dr. Giles was stating that no one had ever *used* the test he performed on any other patient; rather, in response to the question, "[a]re you aware of any medical article or journal or text that gives a name to the sort of test that you used . . . and that approves it for rebutting a finding of CRPS," he appears to have misspoken

while trying to say that he did not know that anyone had ever given the test a name. (*See* Giles Dep. 55–56 ("I do not know that this test has ever been given anybody or any type of name.").)

Several of the plaintiff's other arguments, however, are well taken. Dr. Giles is not an expert in treating CRPS or in neurology. He has not established that the neurological assessment he performed is appropriate for patients complaining of pain associated with CRPS or, indeed, that the test he used has any level of acceptance within the medical community for evaluating a patient with CRPS. Even assuming that the test is relevant to the question of whether the plaintiff was actually suffering nerve-related paralysis, Dr. Giles' own medical notes indicate that the plaintiff was not complaining of paralysis but of a feeling of weakness and "difficulty moving right arm and leg due to pain." (Doc. No. 83-2.) As a matter of common sense, a failure to put much effort into moving his right leg in that circumstance could indicate pain-avoidance as well as malingering, but Dr. Giles does not appear to have taken other explanations into account. Moreover, despite his knowledge that the plaintiff had a diagnosis of CPRS, Dr. Giles did not consider or explain the potential effect of that condition on his assessment.

In short, given the entire context of the encounter, Dr. Giles' assessment that the plaintiff might be malingering does not appear to be well supported by his own medical records or by any generally acceptable methodology. While attacks upon an assessment performed by a treating physician typically go more to the weight to be accorded the opinion than to its admissibility, the defendant in this case has not shown that the proffered opinion is "based on sufficient facts or data," that it is "the product of reliable principles and methods," or that Dr. Giles "reliably applied [generally accepted] principles and methods to the facts of the case." Fed. R. Evid. 702. His opinion regarding malingering is unreliable and, therefore, inadmissible under Rule 702.

Likewise, while hearsay in the form of medical records is routinely admissible under

Rule 803(6) of the Federal Rules of Evidence as the record of a regularly conducted activity, the statement that the plaintiff "walked out" is ambiguous, as the plaintiff points out: it could mean that the plaintiff literally walked out of the Emergency Department on his own two legs, or it could mean, in the colloquial sense, that he left without being discharged—that he "eloped," as indicated elsewhere in the medical records. (*See* Doc. No. 83-2, at 11.) Dr. Giles' understanding of that statement as literal appears to be based on a number of assumptions that are not actually supported by the record, including his assumption that the plaintiff arrived at the nearby pain center ambulating on his own, was placed in a hospital-owned wheelchair while at the nearby pain center to be transported to the Emergency Department, and that he could not have left in a wheelchair unless he "stole" one from the hospital. (*See* Giles Dep. 28–29.) Dr. Giles also stated that he did not believe the plaintiff's wife was present (Giles Dep. 29), even though the medical record states: "Family remains at patient's bedside and has been updated on status of patient's condition." (Doc. No. 83-2, at 10.)

In light, again, of the entirety of circumstances, the statement in the medical record that the plaintiff "walked out" is not relevant, in the sense that it does not make the fact that the plaintiff literally walked out either more or less probable than it would be without that evidence, Fed. R. Evid. 401(a). In addition, even if generally relevant and otherwise admissible, the probative value of the statement is substantially outweighed by the danger of unfair prejudice and misleading the jury.

## IV.    CONCLUSION AND ORDER

For the reasons stated above, plaintiff's Motion *in Limine* to Exclude Defendant's Proposed Expert Witness Testimony of Scott Giles, D.O. (Doc. No. 83) is **GRANTED**.

It is so **ORDERED**.

                                  _____

ALETA A. TRAUGER
United States District Judge